**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-2031**

DONALD ARSENAULT,

              Petitioner,

         v.

BAE SYSTEMS NORFOLK SHIP REPAIR; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS,

              Respondents.

On Petition for Review of an Order of the Benefits Review Board.
(07-0305)

Argued: December 2, 2008              Decided: March 18, 2009

Before GREGORY and AGEE, Circuit Judges, and Rebecca Beach
SMITH, United States District Judge for the Eastern District of
Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Gregory Edward Camden, MONTAGNA, KLEIN, CAMDEN, L.L.P.,
Norfolk, Virginia, for Petitioner. Gerard E. W. Voyer, TAYLOR &
WALKER, P.C., Norfolk, Virginia, for Respondents. **ON BRIEF:**
Charlene A. Morring, MONTAGNA, KLEIN, CAMDEN, L.L.P., Norfolk,
Virginia, for Petitioner. Audrey Marcello, Natalie Pavon Mann,
TAYLOR & WALKER, P.C., Norfolk, Virginia, for Respondent BAE
Systems Norfolk Ship Repair.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Donald Arsenault appeals the decision of the Department of Labor Benefits Review Board ("BRB") denying his claim for compensation from his employer, BAE Systems Norfolk Ship Repair ("BAE"), for occupational hearing loss under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq. (the "Act"). Arsenault v. BAE Systems Norfolk Ship Repair, No. 07-0305 (BRB Sept. 18, 2007) (unpublished). The BRB reversed the earlier Decision and Order of the Administrative Law Judge ("ALJ"), concluding that Arsenault failed to carry his burden of proof that his hearing loss was work-related. For the reasons stated below, we affirm the decision of the BRB.

I.

Arsenault began working as an electrical calibration specialist for BAE in 1986. In October, 2002, he filed a claim for worker's compensation benefits under the provisions of the Act, alleging a 26.9% bilateral hearing loss, as diagnosed by an audiogram conducted at BAE's workplace clinic on August 21, 2002. BAE accepted the claim and compensated Arsenault $22,607.30 for his hearing loss.

The current dispute arises out of Arsenault's second claim for compensation. An audiogram administered at BAE's clinic on November 3, 2004, revealed a 29.4% binaural impairment, which

2

represents a 2.5% increase in hearing impairment over the loss for which he was previously compensated. Alleging that this increase was caused by exposure to work-related injurious noise subsequent to the August 21, 2002, audiogram, Arsenault claimed compensation for occupational hearing loss incurred between August, 2002, and November, 2004. BAE contested this claim on two grounds: (1) that Arsenault had no compensable increase in his hearing impairment; and (2) that he did not sustain exposure to injurious noise levels at his workplace.

A.

During a hearing held on April 18, 2006, ALJ Richard K. Malamphy considered the testimony of several witnesses, including Arsenault; two other BAE employees; Dr. John Erdreich, a physiological acoustician; and Dr. Brian Deutsch, a otolaryngogly and neck surgery specialist. Apart from the testimony and reports of Drs. Erdreich and Deutsch, no other medical evidence was presented.

Arsenault testified that he was exposed to injurious noise on his walk between his vehicle and where he worked,[1] and from

_____

[1] Arsenault also testified that, due to knee problems, he was allowed to park near his work station, but that he had to walk slowly. During his walk, which could take as long as twenty to forty minutes, he was exposed to various noises in the shipyard, including machine noises from sandblasting operations and compressors on the pier. (J.A. 39.)

3

equipment operating near his work station in the calibration lab, located in the machine shop. While he was "not exposed to any constant noise" while in the calibration lab, he occasionally heard noise from two nearby cranes. (J.A. 36.) Two BAE employees also testified that, when the compressors are running on the pier and sandblasting operations are ongoing outside, individuals working in the calibration lab need to raise their voices in order to be heard. (J.A. 32; 74.) Finally, Arsenault testified that he was exposed to high-pitched grinding and welding noises during each of the trips he made across the shipyard to the marine electrical shop. Arsenault made approximately six trips to the marine electrical shop between August, 2002, and November, 2004. (J.A. 37-38.)

Dr. Erdreich was hired by BAE to conduct an acoustical analysis of the BAE facility. He measured noise levels in the machine shop, with the cranes in operation, as well as on the path Arsenault walked from his vehicle to the building. Dr. Erdreich testified, based on these measurements and on the noise-exposure standards set by the Occupational Safety and Health Administration, that the noise to which Arsenault was exposed would not likely cause hearing loss. In Dr. Erdreich's words, "the amount of exposure from the measurements would not be sufficient to produce noise-induced hearing loss." (J.A. 100.) After considering these results, as well as Arsenault's

4

audiograms and testimony, Dr. Erdreich further concluded that Arsenault was not exposed to injurious noise levels at BAE's facility between August, 2002, when he brought his original, successful claim for compensation, and November 3, 2004, when the audiogram that forms the basis for this claim was administered. (J.A. 101.)

BAE also submitted the report and deposition testimony of Dr. Brian Deutsch, as well as his four audiometric evaluations of Arsenault.[2] Dr. Deutsch testified that Arsenault suffers from two types of hearing loss: (1) inner ear hearing loss; and (2) conductive hearing loss, related to his Eustachian tube and eardrum issues,[3] which is "superimposed on top" of the inner ear hearing loss. (J.A. 419-20.) The combination of all of these factors led Dr. Deutsch to characterize Arsenault's overall hearing loss as "pretty significant." (Id.)

Dr. Deutsch further stated that the audiometric evaluations he performed on Arsenault recorded both air-conduction and bone-conduction values. Air-conduction studies measure the noise an individual can actually hear through the external and middle ears, and the results of these studies represent an individual's

---

[2] Arsenault was examined in Dr. Deutsch's office on December 9, 2002; January 19, 2005; April 13, 2005; and May 24, 2005.

[3] Arsenault underwent surgery for Eustaschian tube dysfunction in 1987.

"entire hearing loss" and "overall hearing ability when you combine the noise exposure, the [E]ustachian tube, his age, his genetics, [and] anything else that may be playing a role." (J.A. 416; 421.) In contrast, bone-conduction studies isolate the inner ear and auditory nerve, and measure the sensorineural hearing loss, or hearing loss attributed solely to noise exposure. Noise exposure will "very specifically" cause an inner ear hearing loss, which will be "reflected in the bone line."[4] (J.A. 418.) Based on the results of the bone-conduction testing, Dr. Deutsch concluded that Arsenault did not sustain any increase in his noise-induced hearing loss between 2002 and 2005.[5]

In a decision and order issued November 15, 2006, the ALJ awarded additional benefits of $5,212.16 to Arsenault for his increased hearing loss. The ALJ determined that Arsenault was entitled to the invocation of the presumption, established in Section 20(a) of the Act, that his hearing loss was linked to

---

[4] Arsenault does not dispute Dr. Deutsch's explanation of air-conduction and bone-conduction studies, and the types of hearing loss they measure.

[5] Dr. Deutsch testified that petitioner "certainly has had some noise induced hearing loss" (J.A. 450), but that, based on the bone-conduction studies, there was no increase in noise-induced hearing loss between 2002, when petitioner filed his first, successful claim for compensation, and 2005. (J.A. 429-30.) This time period would necessarily include the audiogram administered in November, 2004, upon which this claim is based.

6

his employment.[6]  The ALJ further concluded that the opinions of Dr. Erdreich and Dr. Deutsch, submitted by BAE, sufficiently rebutted the presumption.  (J.A. 465.)  However, the ALJ then characterized Dr. Erdreich's test results as "speculative" in light of Arsenault's testimony regarding the noises he was exposed to at the workplace.  (J.A. 466.)  The ALJ further found that Dr. Deutsch conceded that Arsenault has work-related hearing loss, even though he attributed most of the loss to other factors.  (Id.)  Thus, after weighing all the relevant evidence and the record as a whole, the ALJ concluded that Arsenault had established a causal relationship between his hearing loss and his employment, and that he was entitled to additional compensation.

B.

BAE appealed to the BRB, alleging that the ALJ erred in invoking the Section 20(a) presumption, and by concluding that Arsenault established additional work-related hearing loss from August, 2002, to November, 2004.  The BRB issued an opinion and order on September 18, 2007, reversing the ALJ's award of compensation.

---

[6] Section 20(a) of the Act creates a presumption that an individual's disabling condition is causally related to his employment.  See 33 U.S.C. § 920(a).  See infra Part II for discussion of this presumption and its legal effect.

7

The BRB upheld both the determination that Arsenault was entitled to the invocation of the Section 20(a) presumption, as well as the conclusion that BAE presented sufficient evidence to rebut the presumption. The only point on which the BRB reversed the ALJ was the propriety of the ALJ's ultimate determination that, based on the record as a whole, Arsenault's 2.5% increase in hearing loss was causally related to noise-exposure in the workplace.

In determining that Arsenault was not entitled to additional compensation, the BRB noted that Dr. Deutsch expressly opined, based on the bone-conduction study results, that Arsenault did not sustain any increase in his noise-induced hearing loss between 2002 and 2004. Further, because Arsenault "did not introduce any medical evidence that his increased hearing loss is due to noise exposure at his employment," the BRB held that he "did not carry his burden of proof to show that noise exposure contributed to his increased hearing loss during this period." (J.A. 528.) The BRB concluded that the ALJ's finding that Arsenault was entitled to additional benefits for hearing loss was not supported by substantial evidence, and reversed the ALJ's award of compensation. This appeal followed.

II.

We review BRB decisions for errors of law and for adherence to the statutory standard governing an ALJ's factual findings. See Norfolk Shipbuilding & Drydock Corp. v. Faulk, 228 F.3d 378, 380 (4th Cir. 2000). Factual findings in the decision under review by the BRB "shall be conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3). The BRB, and this court, will uphold the factual findings of an ALJ, as long as they are supported by substantial evidence. We will not disregard those findings merely because other inferences might have been more reasonable. See Faulk, 228 F.3d at 380 (further characterizing substantial evidence as "more than a scintilla but less than a preponderance," and "such relevant evidence as a reasonable mind must accept as adequate to support a conclusion" (internal quotations omitted)). In short, we review decisions of the BRB to assess whether substantial evidence supported the factual findings of the ALJ, and whether the legal conclusions of the BRB and the ALJ are rational and consistent with applicable law. See Sidwell v. Va. Int'l Terminals, Inc., 372 F.3d 238, 241 (4th Cir. 2004) (noting further that review of the BRB's legal conclusions is de novo and without deference to the BRB's interpretation of the Act).

As previously stated, Section 20(a) of the Act creates a presumption that an individual's disabling condition is causally related to his employment. See 33 U.S.C. § 920(a). An employee seeking to have the benefit of the Section 20(a) presumption must allege "(1) an injury or death (2) that arose out of and in the course of (3) his maritime employment." Universal Maritime Corp. v. Moore, 126 F.3d 256, 262 (4th Cir. 1997). After the presumption is invoked, the burden shifts to the employer to produce substantial evidence to rebut the presumption that the injury is causally connected to the claimant's employment. Id. If the employer does offer evidence sufficient to justify denial of the claim, the presumption disappears from the case and "all relevant evidence must be weighed to determine if a causal relationship has been established, with [the] claimant bearing the ultimate burden of persuasion." Am. Stevedoring Ltd. v. Marinelli, 248 F.3d 54, 65 (2d Cir. 2001); accord Am. Grain Trimmers, Inc. v. Office of Workers' Comp. Programs, 181 F.3d 810, 816-17 (7th Cir. 1999); Director, OWCP v. Greenwich Collieries, 512 U.S. 267, 280-81 (1994) (rejecting "true doubt rule," under which burden of persuasion, not merely burden of production, shifts to party opposing benefits claim).

III.

Arsenault contends that the BRB erred in determining that the ALJ's finding was not supported by substantial evidence. He raises three separate arguments in support of this claim.

A.

Title 33 U.S.C. § 908(c)(13)(E) provides: "Determinations of loss of hearing shall be made in accordance with the guides for the evaluation of permanent impairment as promulgated and modified from time to time by the American Medical Association." The American Medical Association's Guides to the Evaluation of Permanent Impairment (5th ed. 2001) (the "AMA Guides") direct that air-conduction studies shall be used when evaluating hearing loss, and that audiometric readings shall be taken at four specific frequencies. Arsenault first asserts that the BRB erred in relying on Dr. Deutsch's opinion, which was based on audiograms that, he alleges, did not conform to the AMA Guides.

Arsenault argues that Dr. Deutsch's testing was flawed in two respects, only one of which merits discussion.[7] Although Dr.

---

[7] Arsenault argues that some of Dr. Deutsch's audiograms performed on petitioner failed to produce an audiometric reading at the 3,000 Hertz level, as required by the AMA Guides. Based on the information provided by Arsenault, however, the only audiogram that failed to produce a reading at this level was performed on January 19, 2005. Because the claim here at issue is solely based on an audiogram conducted November 3, 2004, which demonstrated the 2.5% increase in hearing loss, failure of
(Continued)

Deutsch used both air-conduction and bone-conduction studies to determine the hearing loss, his conclusions about the cause of the hearing loss were based on the bone-conduction studies. He explained that a noise-induced hearing loss will "very specifically" cause "an inner ear hearing loss, which will be reflected in the bone line." (J.A. 418.) Arsenault contends that this opinion was flawed because it did not follow the AMA Guides, which call for air-conduction studies to "determin[e]" hearing loss, and that the BRB erred in relying on this opinion.

The BRB held that "determination," as used in 33 U.S.C. § 903(c)(13)(E), refers to the extent of a claimant's hearing impairment, not the cause thereof. (J.A. 528 n.4.) Further noting that the Longshore Procedure Manual[8] directs that audiograms must reflect both air-conduction and bone-conduction studies, and that a finding as to the extent of the impairment should be made with reference to the air-conduction results, the BRB concluded that reliance on Dr. Deutsch's opinion is not

subsequent audiograms to conform to the AMA Guides is irrelevant.

[8] The manual is a publication of the Department of Labor's Employment Standards Administration. The chapter cited by the BRB contains the procedures for developing and adjudicating claims for loss of hearing allegedly due to employment covered by the Act. See Longshore and Harbor Workers' Compensation Act Procedure Manual, 3-401.1.

precluded by the AMA Guides or the Longshore Procedure Manual.[9] (Id.)

As the BRB is not a policymaking agency, its interpretation of the Act is not entitled to any special deference. See Potomac Elec. Power Co. v. Director, OWCP, 449 U.S. 268, 278 n.18 (1980). As noted above, this court reviews such interpretations de novo, Sidwell, 372 F.3d at 241, and we find that the BRB did not err in its interpretation of the Act. The AMA Guides "provide the methods employed under the Act for measuring hearing loss," while the statute provides the formula for determining how such losses shall be compensated. Baker v. Bethlehem Steel Corp., 24 F.3d 632, 634 (4th Cir. 1994) (emphasis added). The AMA Guides themselves refer to measuring and computing hearing impairment, not determining its cause. See AMA Guides, 247 (5th ed. 2001). We concur with the BRB that reliance on Dr. Deutsch's opinion is precluded by neither the AMA Guides, nor, therefore, the Act.

### B.

Next, Arsenault alleges that the BRB erred when it relied on Dr. Deutsch's opinion, which used a baseline comparison audiogram administered on December 9, 2002--almost four months

---

[9] The ALJ did not address the propriety of Dr. Deutsch's reliance on the bone-conduction studies.

13

after the audiogram that formed the basis for Arsenault's original, successful claim for compensation. Because this case turns on the causation of the increased hearing loss between August 21, 2002, when the first claim for compensation was brought, and November, 2004, when the instant claim was filed, Arsenault alleges that Dr. Deutsch relied on an improper baseline audiogram and failed to account for the increased hearing loss that may have occurred between August 21, 2002, and December 9, 2002.

Arsenault's argument that "there is no evidence from Deutsch that Mr. Arsenault did not suffer a noise induced hearing loss during the period of August 21, 2002 through December 9, 2002" misses the point. (Appellant's Br. 27.) The claimant bears the ultimate burden of persuasion as to the causation of the injury. See Marinelli, 248 F.3d at 65. Thus, Arsenault bears the burden of presenting evidence regarding causation and he has not put forth substantial evidence or, indeed, any evidence of his own, showing that the increase was work-related. See infra III.C. The absence of such evidence from Dr. Deutsch is not sufficient to meet Arsenault's burden.[10]

---

[10] Because Dr. Deutsch concluded the increased hearing loss was not noise-induced, it necessarily follows that there was "no evidence from Deutsch that Mr. Arsenault did not suffer a noise induced hearing loss . . ." (Appellant's Br. 27.) Such an absence does not indicate that the hearing loss was noise-
(Continued)

For the foregoing reasons, the BRB did not err in relying on Dr. Deutsch's opinion. Dr. Deutsch presented unrebutted testimony that Arsenault did not sustain noise-induced hearing loss between at least December, 2002, and November, 2004, and Arsenault has presented nothing else in the way of medical evidence to show that he did sustain noise-induced hearing loss, either between August, 2002, and December, 2002, or between December, 2002, and November, 2004. See infra Part III.C.

C.

Finally, Arsenault contends that the BRB erred in finding that he failed to provide medical evidence supporting his claim that his hearing loss was caused by work-related noise. There was substantial evidence, he argues, to support the ALJ's finding that his increased hearing loss was due to occupational noise.

Arsenault argues that the audiograms conducted by the BAE clinic and Dr. Deutsch, coupled with the testimony of the BAE employees and Arsenault himself, are sufficient evidence to show

---

induced, and to assert otherwise perverts Dr. Deutsch's testimony and takes it out of context. As discussed above, supra Part I.A, Dr. Deutsch recognized that Arsenault had a "pretty significant" overall hearing loss. (J.A. 419-20.) He concluded, however, that there was no new or increased noise-induced loss between 2002 and 2005. See supra n.5 and accompanying text. Logically and factually, there can be no cause absent an effect.

15

that conditions were present that could cause his increased hearing loss. However, Dr. Deutsch, the only medical expert to opine as to the cause of Arsenault's hearing loss, concluded that the increased hearing loss was not due to noise exposure in the workplace. As outlined above, the BRB did not err in relying on Dr. Deutsch's opinion, and Arsenault himself did not put forth any medical evidence regarding the causation of his hearing loss. See supra Parts III.A and B. Consequently, the BRB did not err in holding there was not substantial evidence before the ALJ to find that the 2.5% increase in hearing loss was caused by work-related injurious noise.

IV.

For the foregoing reasons, we conclude that the BRB properly found that the ALJ's decision was not supported by substantial evidence. Accordingly, we affirm the decision of the BRB, reversing the ALJ's award of compensation.

AFFIRMED

16